**EXHIBIT A**

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 18 MJ 2053 AEP |
| Residence Located at: 721 Powder Horn Row Lakeland, Florida 33809 | ) |
| | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the          Middle          District of          Florida *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before          12/11/18          *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          ANTHONY E. PORCELLI
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for          days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of

Date and time issued:     11/27/18   at   4:05   *Judge's signature*

City and state:     Tampa, Florida          ANTHONY E. PORCELLI, U.S. Magistrate Judge
*Printed name and title*

I CERTIFY THE FOREGOING TO BE A TRUE
AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
BY:
DEPUTY CLERK

# EXHIBIT A

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

| Inventory made in the presence of : |
|---|

| Inventory of the property taken and name of any person(s) seized: |
|---|
| |

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:

*Executing officer's signature*


*Printed name and title*

EXHIBIT A

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Residence Located at: 721 Powder Horn Row
Lakeland, Florida 33809

)
)
)
)
)

Case No. 8:18 MJ 2053 AEP

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Attachement A

located in the        Middle        District of        Florida        , there is now concealed *(identify the person or describe the property to be seized):*

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252(a)(2) | Distribution and receipt of child pornography |
| 18 U.S.C. §§ 2252(a)(4)(B) | Possession of and access with intent to view of child pornography |

The application is based on these facts:

See Attached Affidvait

☑ Continued on the attached sheet.

☐ Delayed notice of        days (give exact ending date if more than 30 days:        ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Tavey Garcia, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/27/18

I CERTIFY THE FOREGOING TO BE A TRUE
AND CORRECT COPY OF THE ORIGINAL
CLERK OF COURT

*Judge's signature*

City and state:  Tampa, Florida        UNITED STATES DISTRICT COURT  ANTHONY E. PORCELLI, U.S. Magistrate Judge
MIDDLE DISTRICT OF FLORIDA        *Printed name and title*
BY:
DEPUTY CLERK

# EXHIBIT A

## <u>AFFIDAVIT IN SUPPORT OF SEARCH WARRANT</u>

I, Tavey Garcia, a Special Agent with Homeland Security Investigations

(HSI), being duly sworn, depose and state as follows:

1.     I am a Special Agent with the United States Department of Homeland

Security, Homeland Security Investigations ("HSI").  I have been employed with HSI

for over eight years. I am currently assigned to HSI, Special Agent in Charge, Tampa,

Florida. I have investigated matters involving the online exploitation of children,

particularly in relation to violations of 18 U.S.C. §§ 2422(b), 2251, 2252, and 2252A,

which criminalize the use of a facility of interstate/foreign commerce to attempt to

knowingly persuade, induce, entice, and coerce a person who had not yet attained the

age of 18 to engage in sexual activity for which any person can be charged with a

criminal offense, and the production, possession, receipt, and transmission of child

pornography. I have made arrests and conducted searches pertaining to these types

of investigations. I have attended specialized courses involving computers and child

exploitation.  As a Special Agent, I am authorized to investigate violations of the

laws of the United States and to execute arrest and search warrants issued under the

authority of the United States.  I have received training for online undercover

investigations involving child exploitation and have participated in numerous

investigations involving child pornography.

2.     This affidavit is submitted in support of an application for a search

warrant for the locations specifically described in Attachment A of this Affidavit,

including the entire property located at 721 Powder Horn Row, Lakeland, Florida

<u>EXHIBIT A</u>

(the "**SUBJECT PREMISES**"), vehicles parked in the driveway of the residence,

known to be associated with "Jack Dove" ("DOVE"), and the content of electronic

storage devices located therein for contraband and evidence, fruits, and

instrumentalities of violations of 18 U.S.C. § 2252, which items are more specifically

described in Attachment B.

      3.     The statements in this affidavit are based on my investigation of this

matter as well as information conveyed to me by other law enforcement officers, to

include other HSI agents as well as special agents of the United States Internal

Revenue Service, Criminal Investigation ("IRS-CI").  Since this affidavit is being

submitted for the limited purpose of securing a search warrant, I have not included

every fact known to me concerning this investigation.  I have set forth only the facts

that I believe are necessary to establish probable cause to believe that contraband and

evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252(a)(2) and

(b)(1) (Distribution and Receipt of Child Pornography); 18 U.S.C. §§ 2252(a)(4)(B)

and (b)(2) (Possession of and Access with Intent to View Child Pornography) are

presently located at the **SUBJECT PREMISES**.

      4.     On or about November 13, 2018, I obtained a search warrant for the

**SUBJECT PREMISES** in case number 8:18-mj-2017CPT. The Honorable

Christopher P. Tuite authorized the execution of the warrant on or before November

23, 2018, between 6:00 a.m. and 10:00 p.m. Between November 13, 2018, and

November 23, 2018, DOVE travelled away from the **SUBJECT PREMISES** over

several days. Despite best efforts, HSI agents were not able to execute the search

# EXHIBIT A

warrant while DOVE was at the **SUBJECT PREMISES** on or before November 23, 2018.

## STATUTORY AUTHORITY

5.      As noted above, this investigation concerns alleged violations of the following:

a.      18 U.S.C. §§ 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

b.      18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, one or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign

3

## EXHIBIT A

commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

### DEFINITIONS

6.      The following definitions apply to this Affidavit and Attachment B:

a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor  engaged in sexually explicit

4

<u>EXHIBIT A</u>

conduct, or (c) the visual depiction has been created, adapted, or modified to appear

that an identifiable minor is engaged in sexually explicit conduct.

      d.    "Computer," as used herein, refers to "an electronic, magnetic,

optical, electrochemical, or other high-speed data processing device performing

logical or storage functions, and includes any data storage facility or

communications facility directly related to or operating in conjunction with such

device" and includes smartphones, as well as mobile phones and devices. *See* 18

U.S.C. § 1030(e)(1).

      e.    "Computer hardware," as used herein, consists of all equipment

that can receive, capture, collect, analyze, create, display, convert, store, conceal, or

transmit electronic, magnetic, or similar computer impulses or data.  Computer

hardware includes any data-processing devices (including central processing units,

internal and peripheral storage devices such as fixed disks, external hard drives,

floppy disk drives and diskettes, and other memory storage devices); peripheral

input/output devices (including keyboards, printers, video display monitors, and

related communications devices such as cables and connections); as well as any

devices, mechanisms, or parts that can be used to restrict access to computer

hardware (including physical keys and locks).

      f.    "Computer passwords and data security devices," as used herein,

consist of information or items designed to restrict access to or hide computer

software, documentation, or data.  Data security devices may consist of hardware,

software, or other programming code.  A password (a string of alpha-numeric

<u>EXHIBIT A</u>

characters) usually operates what might be termed a digital key to "unlock"
particular data security devices.  Data security hardware may include encryption
devices, chips, and circuit boards.  Data security software of digital code may include
programming code that creates "test" keys or "hot" keys, which perform certain pre-
set security functions when touched.  Data security software or code may also
encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or
unusable, as well as reverse the process to restore it.

      g.     "Domain names" are common, easy-to-remember names
associated with an IP address.  For example, a domain name of "www.usdoj.gov"
refers to a specific IP address, such as 149.101.1.32.  Domain names are typically
strings of alphanumeric characters, with each level delimited by a period.

      h.     The "Internet" is a global network of computers and other
electronic devices that communicate with each other.  Due to the structure of  the
Internet, connections between devices on the Internet often cross state and
international borders, even when the devices communicating with each other are in
the same state.

      i.     "Internet Protocol address" or "IP address," as used herein,
refers to a unique number used by a computer or other digital device to access the
Internet.  IP addresses can be "dynamic," meaning that the ISP assigns a different
unique number to a computer every time it accesses the Internet.  IP addresses might
also be "static," if an ISP assigns a user's computer a particular IP address that is
used each time the computer accesses the Internet.

j.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

k.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

l.      "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

m.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

n.      "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

o.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person.

7

<u>EXHIBIT A</u>

p.      A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

q.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

<u>BACKGROUND ON TOR, BITCOIN, AND DARKNET MARKETS</u>

### A. Tor

7.      Tor[1] is a computer network designed specifically to facilitate anonymous communication over the Internet.  To access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle," which is available at www.torproject.org.[2]  Tor effectively bounces a user's communications around a distributed network of relay computers all over the world, making conventional

---

[1] Although, Tor is conventionally spelled with only the first letter capitalized, its name is derived from an acronym for "The Onion Router," which was the name of the original software project from which the Tor network developed.  "Onion routing" refers to the multi-layered application of encryption that shields the user's identity, much like the stratification of an onion.

[2] Users may also access Tor through so-called "gateways" on the open Internet; however, use of those gateways does not provide users with the anonymizing benefits of the Tor network. Additional information outlining Tor and how it works is publicly accessible at www.torproject.org.

<u>EXHIBIT A</u>

methods of identifying users obsolete.[3]  Additionally, entire websites on Tor can be

set up as "hidden services," which operate as ordinary public websites do, with one

critical exception: the IP address (and thus, the location) of the web server is hidden

and replaced with a Tor-based, web address.  This address is comprised of a series of

algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix

".onion."  A user can only reach these "hidden services" if the user is using the Tor

client and operating in the Tor network.  Unlike an open Internet website, it is not

possible to determine the IP address of a computer hosting a Tor "hidden service"

through public searches. Neither law enforcement officers nor users can therefore

determine the location of the computer that hosts the website through those public

searches.

**B. Bitcoin**

8.    Bitcoin ("BTC") is a type of virtual currency, circulated over the internet

as a form of value.[4]  BTC are not issued by any government, bank, or company, but

rather are controlled through computer software operating via a decentralized, peer-

to-peer network.  BTC is just one of many varieties of virtual currency.

---

[3] When a user on Tor accesses a website, the signal bounces around until it exits the network of computers via an "exit node."  The internet-protocol ("IP") address of the exit node (as opposed to the user's actual IP address) appears on the website's IP log.  Currently, there is no practical method to trace a user's actual IP address back through that Tor exit-node IP address.  Tor makes it extremely difficult for law enforcement officers to identify and locate a website-host's administrators or users' actual IP addresses and/or physical locations.

[4] Since BTC is both a currency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

9

<u>EXHIBIT A</u>

9.      BTC are sent to and received from BTC "addresses."  A BTC address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  Each BTC address is controlled with a unique corresponding private key, a cryptographic equivalent of a password or pin needed to access the address.  Only the holder of an address' private key can authorize any transfers of BTC from that address to other BTC addresses.  Users can operate multiple BTC addresses at any given time, with the possibility of using a unique BTC address for every transaction.

10.     To transfer BTC to another address, the sender transmits a transaction announcement, cryptographically signed with the sender's private key, across the peer-to-peer BTC network.  The BTC address of the receiving party and a publicly identified key associated with the sender's private key are the only pieces of information transmitted across the network to initiate and complete the transaction.  These two keys by themselves rarely reflect any identifying information.  As a result, little-to-no personally identifiable information about the sender or recipient is transmitted in a BTC transaction itself. The transaction is added to the blockchain once the sender's transaction announcement is verified. The blockchain is a decentralized public ledger that records all BTC transactions.  The blockchain logs every BTC address that has ever received a BTC and maintains records of every transaction for each BTC address.

11.     While the identity of the BTC address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the

<u>EXHIBIT A</u>

blockchain can often be used to identify the owner of a particular BTC address.  The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity.  For example, a user or business may create many BTC addresses to receive payments from different customers.  When the business wants to move the BTC that it has received, it may group those addresses together to send a single transaction.

12.     Law enforcement uses sophisticated commercial services offered by several different blockchain analysis companies to investigate bitcoin transactions. These companies analyze the blockchain in an attempt to identify the individuals or groups involved with bitcoin transactions.  Specifically, these companies create large databases that group bitcoin transactions into "clusters" through analysis of data underlying bitcoin transactions.  Through numerous unrelated investigations, law enforcement has found the intelligence provided by these companies to be reliable.

13.     Thus, law enforcement can utilize third-party blockchain analysis software to locate BTC addresses that transact at the same time (i.e., the blockchain logs transactions at same time by two different BTC addresses) and "cluster" these addresses together to represent the same owner.  This third-party blockchain analysis software is an anti-money laundering software used by banks and law enforcement organizations worldwide.  This third-party blockchain analysis software has supported many investigations and been the basis for numerous search and seizure warrants, and as such, has been found to be reliable.  Computer scientist have independently shown that they can use "clustering" methods to take advantage of

11

clues in how bitcoins are typically aggregated or split up to identify BTC addresses and their respective account owners.

14.     To acquire BTC, a typical user will purchase them from a BTC virtual currency exchange.   A virtual currency exchange is a business that allows customers to trade virtual currencies for other forms of value, such as conventional fiat money (*e.g.,* U.S. dollars, Russian rubles, euros).  Exchanges can be brick-and-mortar businesses (exchanging traditional payment methods and virtual currencies) or online businesses (exchanging electronically transferred money and virtual currencies).  Virtual currency exchanges doing business in the United States are regulated under the Bank Secrecy Act and must collect identifying information of their customers and verify their clients' identities.

15.     Since the blockchain serves as a searchable public ledger of every BTC transaction, investigators may trace transactions to BTC exchangers.  Since those exchangers collect identifying information about their customers, subpoenas or other appropriate process submitted to these exchangers can, in some instances, reveal the true identity of the individual responsible for the transaction.

### C. Darknet

16.     A darknet, also sometimes inaccurately referred to as the dark web or the deep web, is any online network that is accessible only through the use of specific software, configurations, or authorization, and not generally accessible to users of the public, "open" internet.  All darknets require specific software or network configurations, such as Tor, to access them.  Darknets are often confused with the

12

# EXHIBIT A

dark web, which is a general term used to describe all World Wide Web content that exists on darknets. The dark web is a subset of the deep web, which is all of the internet that is not indexed by traditional web search engines, such as Google. The deep web contains websites and internet locations used by the general population, such as web mail or online banking sites (that is, the subject matter contained with a personalized e-mail account is inaccessible via a traditional web search engine), as well as the dark web.

17.     Darknet markets are typically commercial websites operating as Tor hidden services that primarily function as black markets, selling or brokering transactions involving products such as drugs, unlicensed pharmaceuticals, cyber-arms, weapons, counterfeit currency, stolen credit-card details, forged documents, or, as pertinent to the instant investigation, illicit child pornography. BTC is one of the most common methods of payment for products or services within darknet markets.

## PROBABLE CAUSE

### A. The Website Background

18.     "The Website"[5] is an online child-pornography website located on the darknet with a Tor-based web address known to law enforcement. On or about September 28, 2016, law enforcement agents accessed The Website and documented

---

[5] The actual name of "The Website" is known to law enforcement. The Website remains active and disclosure of the name of The Website would potentially alert its users to the fact that law enforcement action is being taken against users of The Website, thereby provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, to protect the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified herein as "The Website."

13

# EXHIBIT A

its content, as described herein. The Website is used to host and distribute image and video files depicting child pornography and child erotica that may be downloaded by site users. While there may be some images depicting adult pornography accessible on The Website, the overwhelming majority of images and videos observed by law enforcement agents appear to be child pornography or child erotica.[6] In fact, the upload page on The Website clearly mandates: "Do not upload adult porn."

19.     Any user has the ability to create a free account on The Website by providing a username and password. After a user has created an account, the user can browse previews of videos that are available for download and post text to The Website. In order to download videos from the site, however, the user must use "points," which are allocated to users by The Website. Once the user has established a username and password, a user can earn points by: (1) uploading videos depicting the sexual exploitation of children; (2) referring new users to The Website; (3) paying for a "VIP" account, which entitles a user to unlimited downloads, lasts for six months and is priced at 0.03 BTC (approximately $125.58 USD as of September 28, 2017); or (4) paying for points incrementally (i.e. 0.02 BTC for 230 points).

20.     During the course of the investigation, law enforcement agents accessed The Website on multiple occasions and conducted an undercover purchase of VIP access to The Website. Based on review of that activity, it appears that The Website

---

[6] As discussed in paragraph 5, because of the nature of the Tor network, The Website is not accessible through standard search protocol. In order for a user to access The Website, they must know the specific web address of The Website, download Tor software, access the dark web, and affirmatively locate The Website's web address.

14

EXHIBIT A

assigns each user who accesses the site a unique BTC address to which the user can send funds for purchasing account privileges.

21.    Each video available for download has a title, a description (if added by the uploader), "tags" with further descriptions of the video that enable a user to more easily locate a particular category of video using The Website's search function and preview a thumbnail image that contains approximately 16 unique still images taken directly from the video.  As of on or about February 8, 2018, The Website had more than 125,000 unique videos available for downloading.  In order to prevent duplicate videos from being uploaded, The Website provides an MD5 hash-value[7] check so that the user can compare his or her video to other videos previously uploaded to the site.  The Website only allows users to upload videos that have not previously been uploaded to the site.  According to law enforcement's viewing of The Website, the videos stored on The Website account for nearly seven terabytes of data that has been downloaded by users approximately 1,030,000 times.  As a point of comparison, seven terabytes of data would fill roughly 10,486 CD-ROM discs.  As of on or about February 8, 2018, The Website indicated on its download page details that its users have downloaded files on The Website more than one million times.

22.    As part of this investigation, law enforcement officers investigating The Website have downloaded and viewed multiple image and video files of child

---

[7] An MD5 hash-value is the equivalent of a digital fingerprint, and is unique to the specific file, program, or device from which it was generated.

<u>EXHIBIT A</u>

pornography.  Examples of video files on The Website that have been downloaded include:

      a.     A video entitled "japan rape.avi" that is approximately 10 minutes long.  The video depicts a prepubescent Asian girl who appears from her small stature, lack of breast development, and absence of pubic hair to be approximately 9 to 11 years old.  The child is naked with her hands duct-taped to her ankles on either side.  A naked adult male penetrates the child's vagina with his penis and inserts multiple objects into the child's vagina.  This video was uploaded to the site by user "123412" with the description of "Admin Upload."  Based on the description of "Admin Upload," it appears that this video was uploaded to the site by the site's administrator.

      b.     A video entitled "VID-20140907-WA-001.wmv" that is approximately eight-and-a-half minutes long.  A user with the user name "umamed" uploaded the video to the site with the description of "8yo anal fucked pussy."  The video depicts a prepubescent girl who appears from her small stature, youthful appearance, and lack of breast development or pubic hair to be between the ages of six and eight years old.  The child's underwear is pulled down around her thighs and she is wearing a blue t-shirt.  The child is positioned on all fours while a naked adult male penetrates the child's vagina with his penis from behind.  The adult male moves the child into several different positions while continuing to penetrate her vagina with his penis.

16

# EXHIBIT A

c.     A video entitled "rape toddler girl.mpg," which is approximately one minute and twenty-three seconds long.  A user named "anonymous" uploaded the video to the site. The video depicts a toddler girl who appears to be between the ages of approximately two and three years old.  The video shows the child being anally penetrated by an adult male while she cries into her hands.  The video zooms in to focus on the toddler's vaginal area as the adult male's penis penetrates the toddler's anus.

23.     On the video search page of The Website, law enforcement agents observed a list of keyword search terms and the number of videos associated with those keywords.  As of on or about February 8, 2018, some of the top keyword search terms and the associated videos are as follows:

| Keyword | Videos |
|---|---|
| PTHC[8] | 10,967 |
| PEDO[9] | 7,407 |
| 2yo% | 4,541 |
| %4yo | 4,205 |
| Rape | 3,671 |
| Incest | 3,215 |

---

[8] PTHC is a commonly used phrase in the child exploitation context to mean preteen hardcore.

[9] PEDO is a commonly used abbreviation for the word pedophile.

17

EXHIBIT A

B. **Investigation into The Website BTC "cluster"**

24.     As described herein, analysis of the blockchain can reveal additional addresses controlled by the same individual or entity that are part of a "cluster" of BTC addresses.  Using the above-identified reliable third-party blockchain analysis software, law enforcement agents analyzed BTC addresses associated with The Website and identified nearly 3,000 unique BTC addresses clustered together ("The Website cluster") that the software concluded to be associated with The Website. Law enforcement agents corroborated this clustering analysis by following a controlled undercover payment of BTC from an agent's BTC wallet to a BTC address on The Website.  The third-party blockchain analysis software added this undercover transaction to The Website's cluster.

25.     The third-party blockchain software revealed that from in or around October 2015, to in or around February 2018, The Website cluster has received approximately 411 BTC through 7,786 transactions from 4,255 different BTC addresses worth approximately $324,961.  These payments include payments sent to BTC addresses within The Website cluster directly from addresses created through virtual currency exchanges.

26.     Virtual currency exchanges maintain records related to BTC transactions.  A subpoena to one U.S. BTC exchanger yielded records for registered accounts that had sent BTC to The Website cluster.  The subpoena results revealed customer names as well as additional identifiable information.  Most of the individuals reside in the United States.  Approximately 22 exchange accounts had

18

<u>EXHIBIT A</u>

BTC sent to The Website with a note connected to the transaction listing what appears to be a username on The Website or other information further connecting the transaction to The Website (*e.g.,* "[The Website] VIP" and "for User: [username] (230 downloads)").

### C. Users

26.     Based on the instant investigation as described further herein, there is probable cause that an internet user associated with the **SUBJECT PREMISES** has engaged in BTC transactions with BTC addresses within The Website cluster, in amounts that appear to be consistent with payments for "points" on The Website.

27.     Business records returned after a subpoena was served on a United States based BTC exchange revealed that a BTC User with ID number 582c6601c8a1db3f8e01471d, created on or about November 16, 2016, was registered to "Jack Dove" ("DOVE") at the **SUBJECT PREMISES**. The registration information for the BTC exchange account also included the email address "jdove@totalonguardprotection.com," a telephone number associated with DOVE, and internet protocol (IP) addresses including, but not limited to: 70.127.40.255. The BTC exchange records list eight different BTC addresses as belonging to DOVE. The blockchain analysis software has determined that the BTC addresses linked to DOVE have engaged in at least eight BTC transactions.

28.     The above-mentioned account also contained the following payment card details:

EXHIBIT A

   a.      Master card debit card, ending in 2019, issued by Bank of America with the billing address: **SUBJECT PREMISES**.

   b.      Master card, ending in 2020, issued by Citibank with the billing address: **SUBJECT PREMISES**.

   c.      Master card debit card, ending in 2021, issued by Bank of America.

   29.   The blockchain analysis software determined that the above-mentioned BTC account, registered to DOVE, engaged in transactions with a BTC address within The Website cluster between on or about November 16, 2016, until on or about August 23, 2017.  The transactions occurred for approximately 0.52444534 bitcoin bought (valued at approximately $633.55 USD) and 0.06024891 bitcoin sold (valued at approximately $206.25).

   30.   On or about October 9, 2018, I received additional data that had been extracted from The Website, which revealed that DOVE had downloaded approximately 20 child-pornographic videos on or about August 10, 2017, and approximately 18 child-pornographic videos on or about September 3, 2017. Examples of these video files include:

   a.      On or about August 10, 2017, DOVE downloaded a video file titled "_2016-09-20_21-37-34 (2).mp4." This video is approximately two minutes and 30 seconds in length. The video depicts an adult male standing over an adult female and fondling her breasts while the adult female has a prepubescent female child (approximately three to six years old). The video shows the child lying over the adult

# EXHIBIT A

female's lap while another prepubescent child (approximately 8 to 12 years old)

vaginally penetrates the female child with his erect penis.

      b.    On or about August 10, 2017, DOVE downloaded a video file

titled "1st-bj-KO_EDITED 2_.mp4." This video is approximately five minutes and 54

seconds in length. The video depicts a prepubescent female child (approximately 7 to

10 years old) performing fellatio on an adult male's erect penis to ejaculation.

      c.    On or about September 3, 2017, DOVE downloaded a video file

titled "9yo anal-suck-vaginal-good.mp4." This video is approximately one minute

and 57 seconds in length. The video shows a prepubescent child, approximately 8 to

11 years old, being anally, vaginally, and orally penetrated by an adult male's erect

penis.

## D. Identification of the SUBJECT PREMISES

31.    A check of the Florida Driver and Vehicle Information Database

revealed that Jack R. DOVE, III has a valid Florida driver's license registered to

**SUBJECT PREMISES**.  There is another adult with the last name Dove also

registered at the **SUBJECT PREMISES**.

32.    On or about August 31, 2018, I reviewed the Polk County property

records for information related to the **SUBJECT PREMISES**.  According to the

records, DOVE purchased the **SUBJECT PREMISES** in or around March 2011.

33.    On or about October 5, 2018, pursuant to a summons, a representative

of Charter Communications provided subscriber information for IP address

70.127.40.255. The response to the summons revealed that between on or about

<u>EXHIBIT A</u>

June 6, 2017, and on or about August 18, 2017 IP address 70.127.40.255 was associated with "Jack Dove" at the **SUBJECT PREMISES.**

34.    On or about November 5, 2018, I conducted surveillance at the **SUBJECT PREMISES** and observed a black two-door Dodge vehicle, with license plate number GJUF73, parked in the driveway.  The vehicle is not registered to the **SUBJECT PREMISES**, however, is registered to an individual associated with DOVE and his business.[10] DOVE is the primary driver of the vehicle.

35.    HSI agents have been conducting surveillance at the **SUBJECT PREMISES** since obtaining a search warrant for the **SUBJECT PREMISES** on November 13, 2018.

36.    On the evening of November 13, 2018, DOVE's black two-door Dodge vehicle did not return to the **SUBJECT PREMISES** and had been away from the **SUBJECT PREMISES** until Saturday, November 17, 2018.

37.    On or about Sunday, November 18, 2018, DOVE left the **SUBJECT PREMISES** again, this time DOVE drove the second vehicle associated with the **SUBJECT PREMISES** (a four-door Chrysler with license plate number EMWG99) and did not return until on or about Thursday, November 22, 2018 (Thanksgiving Day).  Due to the Thanksgiving holiday, all of the necessary law enforcement

---

[10] DOVE was the owner of Total OnGuard Protection, LLC, a review of Sunbiz revealed that the registered address for the business was the **SUBJECT PREMISES** and that DOVE voluntarily dissolved the business on June 22, 2017. On that same date, DOVE created a fictitious business name "Our Secret Toys" with the registered business address at the **SUBJECT PREMISES**.  This company is listed as "active."

**EXHIBIT A**

agents and personnel were unavailable to execute the search warrant obtained in

case number 8:18-mj-2017CPT prior to the November 23, 2018 expiration date.

38.    On or about Sunday, November 24, 2018, DOVE left the **SUBJECT**

**PREMISES** again, this time in the black Dodge, on or about (with no luggage or

bags observed) and has not yet returned.

39.    DOVE departs and arrives at the **SUBJECT PREMISES** at varying

times throughout the day.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

36.    I have had both training and experience in the investigation of

computer-related crimes.  Based on my training, experience, and knowledge, I know

the following:

a.    Computers and digital technology have revolutionized the way in

which individuals interested in child pornography interact with each other.

Computers generally serve four functions in connection with child pornography:

production, communication, distribution, and storage.

b.    Child pornographers can now transfer photographs from a

camera onto a computer-readable format with a device known as a scanner.  With

the advent of digital cameras and smartphones, images can be directly transferred to

a computer by simply connecting the camera or smartphone to the computer.

Additionally, photographs taken on a digital camera or smartphone may be stored on

a removable memory card in the camera or smartphone.  These memory cards often

store up to 32 gigabytes of data, which provides enough space to store thousands of

high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a camera's hard drive. The video files can be easily transferred from the camcorder to a computer.

        c.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "instant messaging"), and easy access to the Internet, the computer has become a preferred method of distribution and receipt of child pornographic materials.

        d.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files, including external or internal hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices

## EXHIBIT A

that are plugged into a computer's port.  It is extremely easy for an individual to take

a photo or a video with a digital camera or camera-bearing smartphone, upload that

photo or video to a computer, and then copy it (or any other files on the computer)

to any one of these media storage devices (CDs and DVDs are unique in that special

software must be used to save or "burn" files onto them).  Some media storage

devices can easily be concealed and carried on an individual's person.

      e.     Cellular telephones and cellular telephone technology have

further revolutionized the way in which individuals interested in child pornography

interact with each other.  Today's cellular telephones, sometimes referred to as

"smartphones," are capable of not only storing data related to telephone numbers,

contact lists, addresses, voice-mail, and text messages, but often, with both internal

and removable digital memory, cellular telephones are able to store images, videos,

documents, and programs (often referred to on cellular telephones as "applications")

in much the same way a desktop or laptop computer does.

      f.     Many of today's cellular telephones have the ability to access the

Internet through both wireless data plans and through WI-FI Internet connections.

This allows cellular telephone users to perform many Internet functions on their

phones, for example:  downloading and uploading data such as images and videos

from the Internet, sending and receiving e-mails, accessing web pages, browsing the

Internet, using instant messaging services, and conducting live video chat.  The

cellular telephone's ability to access the Internet and store images and videos on its

internal and removable digital memory makes it an ideal repository for child

25

## EXHIBIT A

pornography, much the same as computers, and provides child pornographers with an additional method to share and trade their child pornography collections.

g.      Today's cellular telephones have a large capacity for internal digital memory storage capacity, up to approximately 128 gigabytes in size or more, with additional removable memory storage capacity up to approximately 128 gigabytes or more.  As a result, devices can store thousands of high resolution images as well as videos.  Cellular telephones also have the ability to be synced with, or connected to, a desktop or laptop computer, allowing the cellular telephone user to transfer files to and from the desktop or laptop computer.

h.      The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

i.      Individuals may use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Google, Yahoo! and Hotmail, among others.  The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats.  A user can set up an online storage account from any computer with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

j.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.

26

# EXHIBIT A

Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally. For example, the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains wireless software, was used for instant messaging, and when certain files under investigation were uploaded or downloaded. Such information is often maintained indefinitely until overwritten by other data.

k.      Images taken on cellular phones often contain Exchangeable Image File Format ("EXIF") data containing information related to the images within the image file (e.g., JPEG or TIFF) itself. EXIF data may include information about the time and date the image was taken, settings used by the device to capture an image, including the model of the camera phone used to take the picture, the focal length of the lens, aperture settings, shutter speed, and ISO speed. EXIF data may also contain Geolocation data if the camera phone supports such data, meaning pictures are tagged with the location where they were taken.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

37.     Based on my training, experience, and information relayed to me by agents and others involved in the forensic examination of computers, I know that

27

<u>EXHIBIT A</u>

computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of premises or of devices (including Micro SD cards) found on a person's person, it is not always possible to search computer equipment and storage devices for data immediately on site for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process that requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it also may be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures that are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled

28

<u>EXHIBIT A</u>

environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

      c.     The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

      d.     Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file, which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

     38.     Based on my own training, experience, and consultation with other agents who have been involved in computer searches, searching computerized

29

## EXHIBIT A

information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

      a.    The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

      b.    In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

39.     Additionally, based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime.  This is equally true of so-called "wireless routers," which create localized networks that allow individuals to connect to the Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime— including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

40.     Based on my training and experience, computers may have malware or malicious software that is designed to access or damage a computer or electronic device, usually, without the knowledge of the owner. There are various types of

31

EXHIBIT A

malware, including, viruses, Trojan horses, or malicious software that infiltrates a computer.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS AND DISTRIBUTE CHILD PORNOGRAPHY

41.      Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who utilize the web to access with intent to view, possess, receive, or distribute images of child pornography:

a.      Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity;

b.      Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts;

c.      Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes,

32

<u>EXHIBIT A</u>

magazines, negatives, photographs, correspondence, mailing lists, books, tape

recordings, etc., in the privacy and security of their home or some other secure

location.  Individuals who have a sexual interest in children or images of children

typically retain pictures, films, photographs, negatives, magazines, correspondence,

books, tape recordings, mailing lists, child erotica, and videotapes for many years;

     d.    Likewise, such individuals often maintain their child pornography

images in a digital or electronic format in a safe, secure, and private environment,

such as a computer and surrounding area.  These child pornography images are often

maintained for several years and are kept close by, usually at the possessor's

residence, inside the possessor's vehicle, or, at times, on their person, to enable the

individual to view the child pornography images, which are valued highly.  Some of

these individuals also have been found to download, view, and then delete child

pornography on their computers or digital devices on a cyclical and repetitive basis;

     e.    Importantly, evidence of such activity, including deleted child

pornography, often can be located on these individuals' computers and digital

devices through the use of forensic tools. Indeed, the very nature of electronic storage

means that evidence of the crime is often still discoverable for extended periods of

time even after the individual "deleted" it; and

     f.    Such individuals also may correspond with and/or meet others

to share information and materials, rarely destroy correspondence from other child

pornography distributors/possessors, conceal such correspondence as they do their

sexually explicit material, and often maintain lists of names, addresses, and

<u>EXHIBIT A</u>

telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

       g.     Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[11]

42.     Based on the following, I believe that DOVE likely displays characteristics common to individuals who possess or access with intent to view child pornography. He likely keeps any child pornography at the SUBJECT PREMISES, inside his vehicle(s), or, at times, on his person, to enable DOVE to view child pornography in hard copy or electronic form.

43.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

       a.     on-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer

---

[11] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, *e.g., United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370–71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010).)

<u>EXHIBIT A</u>

systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

b.      forensic imaging of any computers, including on-site imaging of any computers that may be partially or fully encrypted in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for examination; such imaging may require several hours to complete and require law enforcement agents to secure the search scene until that imaging can be completed; off-site imaging will be conducted when on-site imaging is impracticable;

c.      on-site and off-site examination of all of the data contained in such computer hardware, computer software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

d.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

e.      surveying various file directories and the individual files they contain;

f.      opening files in order to determine their contents;

35

# EXHIBIT A

g.   scanning storage areas;

h.   performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

i.   performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

44.   I request the authority to seize, to conduct off-site imaging of the computers or other storage medium, if onsite imaging and analysis is not practical. If no information specified in Attachment B is found, then the items will be returned to the owner.

## REQUEST FOR SEALING OF AFFIDAVIT

45.   It is respectfully requested that this Court issue an order sealing, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the **SUBJECT PREMISES**).  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through forums. Premature disclosure of the contents of this Affidavit and related documents may

36

# EXHIBIT A

have a significant and negative impact on this continuing investigation and may

jeopardize its effectiveness by alerting potential targets to the existence and nature of

the investigation, thereby giving them an opportunity to flee, or to destroy or tamper

with evidence.

## CONCLUSION

46.    Based on the above information, I believe probable cause exists

establishing evidence of a violation of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B),

which make it a federal crime for any person to knowingly possess, receive, or

distribute child pornography that has been mailed, or has been shipped or

transported in interstate or foreign commerce, or which contains materials which

may have been mailed or so shipped or transported, by any means including by

computer.

# EXHIBIT A

47. Based on DOVE's recent demonstrated pattern of travel, I request authority to execute the search warrant of the **SUBJECT PREMISES** at any time in the day or night because good cause has been established.

_____
Tavey Garcia, Special Agent
Homeland Security Investigations

Sworn to and subscribed before me
This 27th day of November 2018.

_____
ANTHONY E. PORCELLI
United States Magistrate Judge

38

# EXHIBIT A

## ATTACHMENT A

### Description of Property to be Searched

The entire property located at 721 Powder Horn Row, Lakeland, Florida 33809 including the vehicles observed to be driven by DOVE a black Dodge two-door (license plate: GJUF73) and a Chrysler four-door (license plate: EMWG99). The residence is a single-story home in a residential neighborhood. The home has a tan exterior with white trim. The double front door appears to be blue/gray in color and is located at the center of the home. To the left of the front door is a two-car garage. The address is clearly marked on the exterior wall of the home to the right of the front door.



<u>EXHIBIT A</u>

## <u>ATTACHMENT B</u>

### Items to be Seized

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § 2252:

1.      All visual depictions, including books, magazines, still images, videos, films or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, and any mechanism used for the receipt, distribution, transportation, production, or storage of the same, including but not limited to:

> Any computers, computer systems, cellular devices with internet and mobile computing capabilities, Personal Data Assistants (PDAs), tablets, and any related peripherals, including any data processing devices and software (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, routers, computer compact disks, CD-ROMs, DVDs, and other memory storage devices) as well as any devices,  mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

2.      Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data.

## EXHIBIT A

Data security devices may consist of hardware, software, or other programming code.

3.     Any and all computer data that would reveal the presence of malware, viruses or malicious codes located on the computer storage media. Evidence of software that would allow others to control electronic devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software.

4.     Any and all documents, records, emails, logs, and internet history (in documentary or electronic form) pertaining to the production, possession, receipt or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining to an interest in child pornography whether transmitted or received.

5.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

# EXHIBIT A

6.      Credit card information, including but not limited to bills and payment records relating to the payment for access to internet child pornography and/or child erotica websites.

7.      Records, documents, invoices, and materials that demonstrate use or control of an Internet Service Provider account, limited to paid bills and paid internet Service Provider bills, as well as all records relating to the ownership or use of computer equipment found in the residence.

8.      Documents and records regarding the ownership and/or possession of the searched premises, limited to paid utility bills, paid telephone bills, and rental agreements.

9.      Records or other items that evidence ownership or use of computer equipment found in the above residence, including, but not limited to, sales receipts, bills for internet access, and handwritten notes.